IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| 1716 W. GIRARD AVE LP,<br>    Plaintiff, | CIVIL ACTION |
| v. | |
| HFM CONSTRUCTION, INC., formerly known as "FHM CONSTRUCTION," SCOTT MULDERIG, Individually and as Agent for the City of Philadelphia, and CITY OF PHILADELPHIA,<br>    Defendants. | NO. 16-4937 |

DuBois, J.                             February 19, 2019

**MEMORANDUM**

## I. INTRODUCTION

This case arises out of the demolition of a building located at 1716 W. Girard Avenue, ordered by the City of Philadelphia's Department of Licenses and Inspections. Plaintiff, a limited partnership formed to purchase and develop that property, asserts that the demolition violated plaintiff's procedural due process rights under the Fourteenth Amendment and seized plaintiff's property in violation of the Fourth Amendment. Plaintiff brings these claims under 42 U.S.C. § 1983. Presently before the Court is Defendants' Motion for Summary Judgment. For the reasons that follow, the motion is denied.

## II. BACKGROUND

The undisputed material facts in the record before the Court, taken in the light most favorable to plaintiff, may be summarized as follows.

Plaintiff, 1716 W. Girard Ave LP, is a limited partnership formed to purchase and develop a property located at 1716 W. Girard Avenue, Philadelphia, Pennsylvania ("the Property"). Defs.' Statement Undisp. Material Facts ("SUMF") ¶ 1. Kevin Young is plaintiff's

general partner and had "sole responsibility for managing [p]laintiff's day to day activities and operations." *Id.* ¶ 2.

Plaintiff purchased the Property in 2009. *Id.* ¶ 4. At that time, the Property "had multiple trees growing through it and was frequented by drug users and prostitutes." *Id.* ¶ 5. From the time it was purchased until its demolition in January 2015, the Property "was never habitable." *Id.* ¶ 7.

Between August 10, 2009, and June 12, 2014, inspectors employed by the City of Philadelphia's Department of Licenses and Inspections Department ("L&I") sent plaintiff five separate Violation Notices designating the Property as "UNSAFE" and detailing the violations which required correction. SUMF ¶¶ 10–13, 15. These violations included, *inter alia*, structural damage caused by trees growing through and outside of the Property. Pl.'s Resp. in Opp. Defs.' Mot. Summ. J. ¶¶ 5–6. Plaintiff "denies timely receipt" of these notices. *Id.* ¶¶ 10–13.

Plaintiff hired defendant HFM Construction, Inc. ("HFM") on or about September 14, 2014, to correct the violations by demolishing a portion of the Property damaged by tree limbs, and to further "make the Property safe." *See* SUMF ¶ 16; *see* Pl.'s Resp. ¶¶ 5–6. HFM hired a subcontractor whose contract included a requirement to obtain the appropriate demolition permit. Sec. Am. Compl. ¶¶ 18–19. However, before such a permit was acquired, HFM began demolition. SUMF ¶ 17.

On September 25, 2014, an L&I inspector sent plaintiff a sixth Violation Notice, which gave plaintiff thirty-five days to cure the violations on the Property and issued a "Stop Work Order" that required all physical work on the Property "being conducted without the appropriate permits and/or in an unsafe manner" to cease. *Id.* ¶ 19. As a consequence, HFM left the partial demolition unfinished. *Id.* ¶ 18.

Plaintiff contracted with a new demolition company to obtain the proper permits and cure the violations on October 20, 2014. Sec. Am. Compl. ¶ 24. Shortly thereafter, plaintiff retained a professional structural engineer to assist in applying for a demolition permit from the City. *Id.* ¶¶ 26, 28.

On November 11, 2014, an L&I inspector sent plaintiff a seventh Violation Notice, again stating that the Property was "in violation" and reiterating the previous "Stop Work Order." SUMF ¶ 20. On November 24, 2014, an L&I inspector sent plaintiff another Violation Notice, this time designating the property as "IMMINENTLY DANGEROUS," based on a finding that there was a "partially collapsed" roof and wall on the Property, and that the "floor/ceiling assembly . . . is deteriorated" and that each of these was "in imminent danger of further collapse." Defs.' Mot. Ex. E, at 3. The Notice ordered plaintiff to "IMMEDIATELY demolish or repair the said premises as necessary" and stated that if plaintiff failed to comply, the City may demolish the Property. SUMF ¶ 21. That same day, L&I also sent plaintiff a Final Notice of Violation and Order, ordering plaintiff to "obtain all necessary permits and to make repairs or demolish the structure to remove the imminently dangerous condition" and again stating that failure to do so may result in the City's demolition of the Property. *Id.* ¶ 22.

Plaintiff filed a Petition for Temporary Restraining Order ("TRO") in the Philadelphia County Court of Common Pleas on or about the following day, November 25, 2014. *Id.* ¶ 24. On November 26, 2014, the Court of Common Pleas held an evidentiary hearing and denied plaintiff's request, concluding plaintiff had not shown irreparable harm. *Id.* ¶ 25; Pl.'s Resp. ¶ 26. The court "informally requested that the parties try to work together to try to resolve the matter." Pl.'s Resp. ¶ 26.

At some point following receipt of the Final Notice of Violation, plaintiff appealed L&I's finding that the Property was imminently dangerous to the Board of Building Standards ("the Board"). SUMF ¶ 23. The Board conducted a hearing on plaintiff's appeal on December 4, 2014, which Young, plaintiff's general partner, attended, with counsel, and presented "drawings, plans, and his intentions for the Property." *Id.* ¶ 28. Specifically, plaintiff submitted two engineer reports that concluded there was no imminent danger on the Property, a plan for demolishing the building, and a letter stating the Property was on the National Register of Historic Places. Sec. Am. Compl. ¶ 42; Pl.'s Resp. 6–7. At the hearing, the Board questioned the sufficiency of plaintiff's engineers' investigations. Defs.' Mot. Ex. E, at 4. The Board informed plaintiff it would meet again in two weeks for an Administrative Review hearing to "reconsider[] [plaintiff's] case" and stated that "the permit should be issued in that timeframe [and] work should be underway." SUMF ¶ 29 & n.5; Defs.' Mot. Ex. E, at 4.

On or about the following day, plaintiff submitted "another application for zoning to complete the demolition and eliminate any outstanding violations." Sec. Am. Compl. ¶ 44. Plaintiff also hired another engineer, Robert Rosen, to evaluate and assess the condition of the Property. *Id.* ¶¶ 46–47. Rosen submitted a report on December 17, 2014, finding that the Property was "reasonably stable and in . . . no need for immediate bracing systems. *Id.* ¶ 47. Plaintiff submitted this report to L&I. Pl.'s Resp. Ex. G, at 1.

On December 18, 2014, the day of the Administrative Review hearing, plaintiff asserts that upon arrival at the hearing, it was informed the hearing would be continued due to inclement weather. *Id.* Nevertheless, the hearing was held that day, in plaintiff's absence, and plaintiff claims it did not learn about the hearing until the Property was demolished on January 6, 2015. *See id.* Thereafter, L&I Commissioner sent plaintiff a letter, dated December 22, 2014,

4

summarizing the minutes from the two hearings, the alleged property violations, and the Board's recommendation. Defs.' Mot. Ex. E, at 5. The Board recommended plaintiff be given "not more than two weeks from December 18, 2014"—until January 2, 2015—to "obtain the necessary permit and immediately begin work on the Property." SUMF ¶¶ 30–31; Defs.' Mot. Ex. E, at 5. Plaintiff claims the letter was not postmarked until December 28, 2014, and that it was not received until January 4, 2015. Pl.'s Resp. ¶¶ 30–31.

On December 23, 2014, Pradeep Parekh, an engineer with L&I, emailed plaintiff, informing him that L&I received and accepted Rosen's report, approving plaintiff's permit application "to 'make safe' the site by removing the Imminently Dangerous (ID) classification currently attached to the property . . . in addition to legalizing previous demolition work" done without a permit. *Id.* However, Parekh explained that this determination was pending the approval of the Emergency Services Unit, a subdivision of L&I, headed by Chief Scott Mulderig. *Id.*; Pl.'s Resp. 12. Specifically, the email states:

> The Permit language will be adjusted to identify the 'make safe' nature of the work only if the Emergency Services Unit (CC'd on this email) deems that the front portion [of the Property] can be maintained and <u>not considered an ID condition</u>. If such conclusion cannot be made with the current submission the Permit application will simply legalize the demolition that was performed without securing permits while any ID classification will stand until further work as approved by the Department is proposed and clarified.

Pl.'s Resp. Ex. G, at 1 (emphasis in original). Finally, Parekh gave plaintiff sixty days to submit additional information in support of plaintiff's permit application. *Id.* Plaintiff submitted additional information pursuant to these instructions on January 2, 2015. Pl.'s Resp. Ex. B-3, at 1.

On January 5, 2015, at 5 p.m., Elizabeth Baldwin, Director of L&I's Development Division, emailed plaintiff, stating that L&I had completed its review of Rosen's report and plaintiff's additional submissions and determined that they were "incomplete and insufficient."

5

Pl.'s Resp. Ex. B-4, at 1. Baldwin also stated that plaintiff failed to follow the Board's instruction to obtain a permit on or before January 2, 2015; that plaintiff's permit application was now "abandoned"; and that Parekh's sixty-day extension was canceled because it was "made without knowledge of the Board['s] decision and is superseded by that decision." *Id.* Baldwin concluded, "I have been advised that the Department [of L&I] will move forward with the demolition of this building to immediately address the threat to life safety posed by the building in it's [sic] current state." *Id.* Both Parekh and Mulderig were copied on this email. *Id.*

The next morning, on January 6, 2015, Pedro Palmer Construction, Inc., acting as an agent for the City, began demolishing plaintiff's property. SUMF ¶ 33. Plaintiff claims that upon completion of the demolition, L&I submitted a bill to plaintiff for $23,232. Sec. Am. Compl. ¶ 66.

Plaintiff filed a Complaint on September 14, 2016. Plaintiff filed an Amended Complaint on April 13, 2017 (Document No. 28) and a Second Amended Complaint on May 4, 2017 (Document No. 32). Plaintiff's Second Amended Complaint asserts that defendants violated its procedural due process rights under the Fourteenth Amendment by failing to give plaintiff adequate notice of the demolition and the opportunity to be heard (Count I) and constitutes an unconstitutional seizure of plaintiff's property in violation of the Fourth Amendment (Count II). Plaintiff brings these claims pursuant to 42 U.S.C. § 1983.

At this stage in the proceedings, two defendants remain in the case: the City of Philadelphia and Mulderig, sued individually and as an agent of the City.[1] Defendants filed the pending Motion for Summary Judgment on May 19, 2018 (Document No. 49), asserting that plaintiff failed to adduce evidence to support that the City is liable under a theory of municipal

---

[1] The Court notes that a default was entered against a third defendant, HFM, on January 16, 2017.

liability or that Mulderig was liable for personal involvement in the demolition decision.[2] Plaintiff filed a Response in Opposition to the Defendants' Motion for Summary Judgment on July 9, 2018 (Document No. 53). Defendants' Motion for Summary Judgment is thus ripe for review.

**III.     LEGAL STANDARD**

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. However, the existence of a "mere scintilla" of evidence in support of the nonmoving party is insufficient. *Id.* In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing summary judgment must, however, identify evidence that supports each element on which it has the burden of proof. *Celotex Corp.*, 477 U.S. at 322.

---

[2] Defendants do not address plaintiff's underlying claims of Fourth and Fourteenth Amendment violations in their Motion.

7

## IV. DISCUSSION

Defendants argue that plaintiff has failed to adduce evidence showing (1) that the City is liable because the demolition was the product of an unconstitutional municipal policy or custom under *Monell* or (2) that Mulderig is liable because he was personally involved in the decision to demolish the Property. For the reasons that follow, the Court concludes genuine issues of material fact remain with respect to both claims. Thus, Defendants' Motion for Summary Judgment is denied.

### A. The City's Municipal Liability Under *Monell*

The liability of a municipality under 42 U.S.C. § 1983 is governed by *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Under *Monell*, a municipality cannot be held liable on a theory of *respondeat superior*. 436 U.S. at 691. Rather, a municipal entity is liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" deprives a citizen of constitutional rights. *Id.* at 694. An official policy is a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers." *Id.* at 690. A custom exists when a "widespread practice . . . not authorized by written law or express municipal policy[] is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

With this background, the acts of a government employee render a municipality liable in three circumstances: (1) "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy"; (2) "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself"; or (3) the "policymaker has failed to act affirmatively at all, [though] the

8

need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" *Bd. of Cty. Cmm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 404, 417 (1997) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)).

Defendants argue plaintiff has failed to adduce evidence of a municipal policy or custom, because plaintiff offered no evidence that the City or L&I have engaged in similar conduct in other cases. Defs.' Mot. 7. Defendants further assert that there no evidence in the record that any municipal policymaker was "aware of a pattern of violations with respect to property demolitions in the City, or that any such person acted or failed to act with deliberate indifference to the rights of property owners in the City." *Id.*

Plaintiff argues that the City and Mulderig's actions in this case are consistent with previous cases in the Eastern District of Pennsylvania, in which courts have concluded that the City has a custom or policy of demolishing buildings without providing appropriate notice. *See* Pl.'s Resp. 9–11. In *Gordon v. City of Philadelphia*, for example, the court concluded, "The City's demolition decision and its execution were made in accordance with apparent City 'custom' or 'policy,' allowing the City to make a decision to demolish, and then within hours to solicit bids from contractors for demolition, and have the contractor demolish the property within three hours of acceptance of the bid." No. 07-5039, 2009 WL 2710247, at *5 (E.D. Pa. Aug. 28, 2009); *see also Bullard v. City of Phila.*, 847 F. Supp. 2d 711, 722 (E.D. Pa. 2012) ("[T]his Court has previously addressed the City's custom of making the decision to demolish, and then, within hours, soliciting bids from contractors and demolishing the building, and found that such a procedure does not comport with due process." (citing *Gordon*, 2009 WL 2710247, at *5)).

9

The Court concludes that a reasonable jury could find that the demolition of the Property was a continuation of the same municipal policy or custom described in *Bullard* and *Gordon*.³ *Cf. Philly Auto, Inc. v. City of Phila.*, No. 18-669, 2019 U.S. Dist. LEXIS 11882, at *14 (E.D. Pa. Jan. 24, 2019) (reaching same conclusion). Defendants contend that this Court should instead follow case law in this District that found no municipal liability. *See* Defs.' Mot. 6–7. However, the case law on which defendants rely is notably distinguishable from this case. In *Van Der Leer v. City of Philadelphia*, unlike the present case, plaintiff failed to offer evidence of *any* situation similar to the present case. No. 03-4324, 2004 WL 1336315, at *4 (E.D. Pa. June 15, 2004). In this case, plaintiff points to the conduct in *Bullard* and *Gordon*, among other cases. Pl.'s Resp. 9–11. In *Fair Hill Management v. City of Philadelphia*, plaintiffs argued that the City *failed* to follow its written policies, rather than arguing that it acted pursuant to a policy or custom, like this case. No. 13-7212, 2015 WL 5092879, at *2–3 (E.D. Pa. Aug. 28, 2015).

Further, plaintiffs name two individuals as possible final decisionmakers who acted pursuant to a municipal policy or custom. First, plaintiff asserts that Baldwin, the Director of the Development Division who emailed plaintiff that the Property was to be demolished, made the "unilateral decision" to demolish the Property after being informed "by an unknown source[] that the property was unsafe." Pl.'s Resp. 10. However, plaintiff also states that Baldwin was "acting as a messenger" for a different decisionmaker, as evidenced by Baldwin's statement that she was "*advised* that the Department will move forward with the demolition." *See id.* at 2. Second, when addressing defendants' supervisory liability arguments, plaintiff asserts that Mulderig, Chief of the Emergency Services Unit, was the final decisionmaker, as evidenced by the series of emails plaintiff received from Parekh and Baldwin in the days leading up to the

---

³ Plaintiff asks this Court to take "judicial notice" that the actions of the City are the result of a municipal policy or custom. *See* Pl.'s Resp. 11. The Court finds *Bullard* and *Gordon* persuasive and need not take judicial notice of those decisions.

10

demolition. *Id.* at 12. Specifically, plaintiff contends that because Parekh stated L&I would approve plaintiff's permit and remove the "imminently dangerous" classification unless the Emergency Services Unit advised otherwise, and roughly two weeks later, Baldwin stated that the Property was to be demolished, "[c]learly the advisement came from the Emergency Services [Unit] of which Scott Mulderig was the [Chief]." *Id.*

The Court concludes that while plaintiff has failed to adduce evidence showing Baldwin was the decisionmaker, a reasonable jury could find that Mulderig either made the decision to demolish the Property himself pursuant to a municipal policy or custom, or was aware, as Chief of the Emergency Services Unit, of the "inadequacy of" the City's policies and customs regarding property demolitions and in failing to control the agents of the government was "deliberately indifferent" to the constitutional rights of property owners. *See Bd. of Cty. Cmm'rs*, 520 U.S. at 417. In reaching this decision, the Court relies in substantial part on *Bullard*, which found municipal liability based on deposition testimony from Mulderig stating that he had "full and final authority to order that a property be demolished," that he "directed that the Property be demolished," and that "the procedures implemented in [the] case were regularly implemented by the Unit." *See Bullard*, 847 F. Supp. 2d at 722. While the Court rebukes plaintiff's poor efforts to develop the record and its sloppy and inconsistent briefings, the Court cannot say, viewing the facts in the light most favorable to plaintiff, that there is no genuine dispute of material fact with respect to this claim.

Because issues of material fact remain as to whether the demolition of the Property occurred pursuant to the decision of a final decisionmaker acting pursuant to a City custom or policy, the motion for summary judgment must be denied with respect to the City of Philadelphia.

## B. Mulderig's Supervisory Liability

Supervisors cannot be held liable under § 1983 on the basis of *respondeat superior*. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Instead, a defendant in a civil rights action must have "personal involvement in the alleged wrong." *Id.* In other words, a supervisor is "only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (explaining "the term 'supervisory liability' is a misnomer"). Defendants assert that plaintiff has presented no evidence that "Mulderig himself ordered or directed the demolition of the Property." Defs.' Mot. 7.

Since *Iqbal*, the Third Circuit's standard for supervisory liability under § 1983 has been "uncertain." *Arguetta v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, 70 (3d Cir. 2011). Before *Iqbal*, a supervisor was liable in one of two situations: (1) a policymaker-supervisor, with "deliberate indifference to the consequences, . . . established and maintained a policy, practice or custom which directly caused the constitutional harm"; or (2) a supervisor "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). After the Supreme Court concluded in *Iqbal* that a supervisor is "only liable for his or her own misconduct," it is unclear whether a supervisor's knowledge of a constitutional violation by another is sufficient to impose liability. *See Bayer v. Monroe Cty. Children & Youth Servs.*, 577 F.3d 186, 191 (3d Cir. 2009).

After reviewing the record, the Court concludes that under either pre- or post-*Iqbal* standards, the motion for summary judgment must be denied. Under either standard, a reasonable jury could conclude that Mulderig violated plaintiff's rights by directing the Property to be demolished in violation of plaintiff's constitutional rights.

In arguing that plaintiff failed to adduce evidence connecting Mulderig to the demolition decision, defendants point to Young's deposition testimony. Defs.' Mot. 7. When Young was asked, "Do you have any knowledge as to whether Scott Mulderig had any responsibility for actually ordering the demolition of this property or not?" Young responded, "It is my knowledge that he is in charge of emergency—at the time he was in charge of emergency services, and he just did his work arbitrarily depending on his mood." Defs.' Mot. Ex. A, Young Dep. 113:1–7. The Court rejects this argument. Mulderig's position as Chief of the Emergency Services Unit supports the conclusion that Mulderig was responsible for the decision to demolish the Property. Additionally, the emails from Parekh and Baldwin are evidence that the Emergency Services Unit and Mulderig were responsible for the demolition decision. *See* Pl.'s Resp. 12.

Viewing the facts in the light most favorable to plaintiff, the Court concludes that there is a genuine dispute of material fact as to whether Mulderig was the final decisionmaker. A reasonable jury could conclude, considering Mulderig's position as Chief of the Emergency Services Unit and the emails from Parekh and Brown, that Mulderig was responsible for the demolition decision. This conclusion is further supported by *Bullard*, in which the court received in evidence deposition testimony from Mulderig that he had full and "final authority to order that a building be demolished" as Unit Chief. 847 F. Supp. 2d at 714. For these reasons, the Court denies the motion for summary judgment on this claim.

V. **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is denied. An appropriate Order follows.